IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 29, 2022 Session

## MALCOLM D. MYERS AS EXECUTOR OF THE ESTATE OF CHARLES PRICE BOONE v. DAWNA DIVINE BOONE

**Appeal from the Circuit Court for Shelby County**
**No. CT-000783-17  Gina C. Higgins, Judge**

———————————————————

### No. W2020-01167-COA-R3-CV

———————————————————

This appeal stems from a divorce proceeding, in which the Shelby County Circuit Court ("Trial Court") found that two billboard marketing agreements for billboards located at 5871 Poplar Avenue and 0 Ricky Bell Cove were property belonging to the corporation, St. Charles Place, Inc., a corporation owned solely by Husband.  The Trial Court found that the parties' marriage was short-term in nature and distributed the marital property, awarding Dawna Divine Boone ("Wife") 60% of the marital estate and Charles Price Boone ("Husband") 40% of the marital estate.  Discerning no reversible error, we affirm the Trial Court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY W. ARMSTRONG, J., joined.

Donald Capparella and Patrick Riley, Nashville, Tennessee, for the appellant, Dawna Divine Boone.

Daniel Loyd Taylor and John N. Bean, Cordova, Tennessee, for the appellee, Malcolm D. Myers as Executor of the Estate of Charles Price Boone.

## OPINION

## Background

Husband formed his corporation, St. Charles Place, Inc., in the mid-1990s. During all times, Husband was the sole owner of St. Charles Place, Inc. Husband's corporation was successful, and he amassed significant wealth prior to the marriage. Wife came into the marriage with significantly fewer assets than Husband.

Wife and Husband married in October 2014. Prior to the marriage, Husband acquired the two pieces of real property located at 5871 Poplar Avenue and 0 Ricky Bell Cove and the billboards that were placed on the property, either in his own name or that of his corporation. The Trial Court found that the billboards and the land where the billboards sit were property owned by Husband or his corporation.[1] The Shelby County Assessor of Property lists Husband as the owner of the 0 Poplar Avenue property, and the 1995 warranty deed for the land underneath the billboard at 5871 Poplar Avenue lists Husband as the owner of the land.[2] During the marriage, Husband never added Wife's name to the deed to the property at 5871 Poplar Avenue or to any permit indicating ownership of the building. Additionally, the 1997 warranty deed for the land where the 0 Ricky Bell billboard is located lists St. Charles Place, Inc. as the owner, and St. Charles Place, Inc. is also listed as the registered owner of the property at 0 Ricky Bell Cove with the Shelby County Register's Office. Husband never placed Wife's name on the deed to the property at 0 Ricky Bell Cove or any permit relevant to the property.

In April 2015, the parties entered into two billboard marketing agreements with Outfront Media LLC (collectively, the "Billboard Marketing Agreements"). Both Billboard Marketing Agreements begin as follows in pertinent part: "**THIS MARKETING AGREEMENT** is made and entered into as of the 9th day of April, 2015 (the "Effective Date"), by and between **Charles and Dawna Boone** ("Owners") and **OUTFRONT Media LLC** ("OUTFRONT")." The contracts require payments to the owner. In the signature area at the bottom of both documents, it lists "St. Charles Place" as the owner, with both Husband's and Wife's signatures underneath. Husband also had written "President" after his signature.

Wife assisted Husband in the business until they separated in February 2017. After the parties' separation, Wife was no longer involved in the business. Husband filed a complaint for divorce in February 2017, alleging irreconcilable differences and

---

[1] On appeal, there is no issue raised concerning who owns the billboards or the land beneath the billboards, only classification of the two marketing agreements pertaining to these billboards.

[2] The location of this billboard is referred to in the record as both 5871 Poplar Avenue and 0 Poplar Avenue.

inappropriate marital conduct by Wife.[3] Wife filed an answer to the complaint denying that irreconcilable differences existed or that she was guilty of inappropriate marital conduct. In her answer, she requested that Husband's complaint for divorce be dismissed and the costs taxed to Husband. She also requested an award of attorney's fees and expenses incurred.

The Trial Court conducted a trial over several nonconsecutive days beginning in January 2018 and ending in August 2019. During the trial, the Trial Court heard testimony from several witnesses including: (1) David Hogue, the real estate manager for Outfront Media, (2) Husband; (3) Gladys Jones, the parties' housekeeper during the marriage; (4) Wife; and (5) Derenda Riddick Cannon, a close friend of the parties.

David Hogue testified at trial that he was the real estate manager for Outfront Media, which is a billboard company. According to Mr. Hogue, he finds sites that comply with state laws and ordinances for the company to lease and build billboard sites. Mr. Hogue testified that Husband and Wife came into his office to get the company's expertise on upgrading the billboards located at 5871 Poplar Avenue and 0 Ricky Bell Cove to digital. According to Mr. Hogue, Husband wanted the contracts to be in both his and Wife's names and "wanted to set this up for his wife because this was his way he was going to take care of her." Mr. Hogue explained that Husband told him that he wanted to convert the billboards and to put both parties' names on it so that it would all go to her when he died. Two Billboard Marketing Agreements were executed which reflected a 20-year marketing agreement for Outfront Media to market the two billboard locations. Mr. Hogue prepared the contracts and requested Wife sign the contract as well since her name was included on it.

As part of the process, Mr. Hogue assisted the Boones in filing the necessary paperwork to obtain local and state permits to begin the conversion. Obtaining the permit for the Poplar location was more difficult and required them to hire an attorney to assist them in obtaining a variance with the Memphis and Shelby County Board of Adjustment. According to Mr. Hogue, both Husband and Wife were present at the hearing for the variance approval. An application for a City of Memphis building permit for construction code enforcement for one of the billboards listed Husband as the owner of the billboard. However, Mr. Hogue stated that the application did not require all owners to be listed. According to Mr. Hogue, Wife was heavily involved in the process. Mr. Hogue testified that he believed Tennessee law requires the transfer of ownership of a billboard to be done in writing.

In February 2016, Outfront Media began sending checks to both Husband and Wife. Mr. Hogue stated that after the divorce action was filed, Outfront Media received

---

[3] During the pendency of the divorce proceedings, Husband filed an amended complaint to add Outfront Media, LLC as a party to the divorce due to their interest in the Billboard Marketing Agreements.

correspondence from Malcolm Myers, a certified public accountant, requesting that all future checks be endorsed to St. Charles Place, Inc.

Husband also testified at trial. Husband had a college degree and a law degree; however, he did not practice law. Husband testified that prior to the marriage with Wife, he already had accumulated a large estate; owned a successful real estate company, St. Charles Place, Inc.; and had made a lot of investments in real estate property. Husband acknowledged that St. Charles Place, Inc. had no employees other than himself. Husband testified that he owned the billboard at 5871 Poplar Avenue prior to the marriage, as well as the land on which the billboard sits. Husband testified that he never put Wife's name on the land or on the permit. Additionally, Husband stated that the billboard at 0 Ricky Bell Cove was owned and paid for by Husband prior to the marriage and that Wife's name was never placed on the title or permit involving this billboard.

According to Husband, Wife had no experience in commercial real estate or in the ownership or development of billboards prior to the marriage. Husband acknowledged that Wife had been helpful on some things with the business but stated that he worried about Wife's stances on certain things. Wife had looked after him if someone was trying to take advantage of him. He acknowledged that Wife met and communicated with accountants and lawyers concerning the business. In 2012, Wife was listed as a secretary for the company. In 2013, 2014, and 2015, she was listed as both a secretary and on the board of directors. Husband testified that Wife was not paid a salary for the work she did with St. Charles Place. With Wife's assistance, St. Charles Place, Inc. completed a deal to sell a piece of property to Hilton during the marriage. Husband testified that Wife was pushing Husband to complete the Hilton deal, but he did not think they got enough money for the property. Husband stated that she had attended meetings concerning this deal and helped in the negotiations. After the divorce was filed, Husband began paying a man named Biff Concklin $3,000 to $3,500 a month. Husband explained that Mr. Concklin was his "real estate man."

In addition to St. Charles Place, Inc., Husband has an international charitable organization called "Reading Bear." Husband testified that during a period of time, Wife was actively working and trying to get things accomplished for Reading Bear. Husband stated that there were times when Wife was important and times when she had very little to do with the operations.

Husband stated that he and Wife attended meetings prior to the Billboard Marketing Agreements being signed. Husband testified that he signed the Billboard Marketing Agreement for 5871 Poplar as president of the corporation. He acknowledged that Wife had signed the document but stated that she was not an owner. Changes were made to the document and initialed by both Husband and Wife. According to Husband, the document was flawed. Concerning the Billboard Marketing Agreement for 0 Ricky Bell Cove, Husband likewise acknowledged Wife's name is listed as an owner in the

body of the contract, that he and Wife had initialed changes made to the document, that he had signed the document as president of St. Charles Place, Inc., and that Wife's signature appeared along with his signature at the bottom of the document. On the line next to owner at the end of the contracts, Husband wrote that the owner was St. Charles Place. According to Husband, he did not believe Wife signed the contracts initially but only after they were sent back for her to sign. Following the Billboard Marketing Agreements, the checks from Outfront Media were made out to both Husband and Wife. After the divorce proceedings began, Outfront Media declined Husband's request that all subsequent payments be endorsed to St. Charles Place.[4]

Husband testified that he had hired someone to complete the approval process to begin the conversion of the billboards to digital and stated that Wife did not have much to do with this process. According to Husband, Wife did not stand up and talk at any of the meetings with the Board of Adjustment.

At the time of trial, Husband was 84 years old. Husband testified that he had a knee and hip replacement. He also had what he believed to be a hernia, but he stated that medical doctors removed "something the size of a baseball" from him. Ten years ago, he had a stroke. Husband stated that he recently had a "pain blocker" on his back and is planning to get one on his neck. He has trouble hearing, has lost his sense of smell, and has trouble focusing.

Wife testified that she obtained a college degree from the University of Memphis in 2003 for exercise, sports science, and health promotion. From 2003 to 2008, Wife worked at an insurance company. Wife made at most $25,000-30,000 per year at the insurance company before she was laid off in 2008. Prior to the marriage, Wife was employed part-time at an antique store. Wife testified that she left her job at the antique store approximately one month after the marriage. While employed at the antique store she was paid $10 per hour. According to Wife, Husband told her that she did not need to work anymore because they did not need the money but that he needed her to help him with the business, St. Charles Place, Inc., and the non-profit, St. Charles Place Education Foundation or "Reading Bear." At the time of trial, Wife was again employed part-time at the same antique store she worked at prior to the marriage, working once or twice a week.

Coming into the marriage with Husband, Wife had no savings, no real estate, and no retirement. Prior to moving in with Husband, Wife had been living with her mother, and her mother had assisted her with some of her finances. Wife testified that she had gotten a settlement from a car accident and that she had the Mercedes 220 that Husband

---

[4] The record refers to a separate lawsuit that Husband initiated against Outfront Media alleging breach of contract regarding the Billboard Marketing Agreements.

bought her prior to the marriage. Wife also testified that she had brought "a massive amount of furniture" into the marriage, an assertion which Husband denied.

According to Wife, she moved in with Husband in the summer of 2012. Prior to and during the marriage, Wife worked with Husband in the business. Wife testified that Husband had no assistant and no employees and that she began assisting Husband with the business. Wife testified that she was involved in the day-to-day operations of St. Charles Place during the marriage prior to the filing of the divorce complaint. Wife testified that she took on the role of personal assistant or secretary to Husband when it came to the business and helped keep Husband organized. She created files, returned phone calls, and checked emails for Husband. Wife testified that she and Husband would often go to the properties together if they were showing a property. Additionally, Wife stated that she cleaned properties with her housekeeper, pulled weeds, did yard work, and did whatever it took to sell the lots.

She further testified that an individual came to their house and they developed a website for St. Charles Place, Inc. with property listings, availability, and an autobiography for Husband. She stated that the contact number for the commercial property was listed as her cellular telephone number. According to Wife, she met with accountants regularly, met and negotiated with tenants, routinely met with Husband concerning the business, met with lawyers, met with Outfront Media representatives, and appeared before a governing body concerning converting the billboards to digital. Wife testified that she was an officer, secretary, and on the board of directors for St. Charles Place, Inc.

Wife testified that she helped Husband with the Hilton Hotel contract and sale of property, which resulted in a profit of one million dollars. Wife stated that the accountant instructed them to put the money back into St. Charles Place, Inc., and the idea to upgrade the billboards to digital was both hers and Husband's. According to Wife, they used the profits from the sale to pay for the digital billboards, avoided a capital gain, and got a tax break.

Concerning the Billboard Marketing Agreements, Wife testified that she initiated the first meeting with Outfront Media. Wife stated that she and Husband were both present for multiple meetings with Outfront Media, and the conversions of the billboards to digital occurred during the marriage. According to Wife, Husband instructed Mr. Hogue how to draft the Billboard Marketing Agreements. Wife explained that Husband knew Wife was worried about her health and the risk of becoming sick again, and he wanted to make sure Wife was taken care of with the two Billboard Marketing Agreements. According to Wife, they had hired a zoning attorney and another individual to complete the application seeking approval to upgrade one of the billboards and appear before the Board of Adjustment. Wife acknowledged that she had not spoken at the meeting before the Board of Adjustment but stated she had to prepare for it. Wife

testified that the checks they received from Outfront Media as a result of the Billboard Marketing Agreements were endorsed to both Husband and Wife as individuals.

Wife testified about her health conditions. She has been in remission from Hodgkin's Lymphoma since 2005, has a fast heartbeat, takes cholesterol medication, has hypothyroidism, and has had leukopenia which was treated with "bone marrow to the hip." Wife further stated that she was at high risk for breast cancer. According to Wife, her medical condition affects her daily functioning because her thyroid sometimes makes her "a little overly tired." She stated that her medical conditions had escalated since the divorce proceedings began.

Gladys Jones, the parties' housekeeper testified that Husband and Wife frequently worked in the business and attended business meetings together. According to Ms. Jones, Husband told her that Wife had been helpful. She did not actually observe what Husband and Wife had been doing regarding the business. Additionally, Derenda Riddick Cannon, a close friend of both Husband and Wife, testified that Husband told her that Wife had helped him get organized and helped with the business. According to Ms. Cannon, Wife showed her a "stack" she had been organizing for meetings.

Following trial, the Trial Court took the matter under advisement. The Trial Court entered the final decree of divorce in July 2020. At the time, Husband was 85 years old, and Wife was 52 years old. The Trial Court granted Husband a divorce and found that this marriage was a short-term marriage of approximately five years. The Trial Court made the following finding in its judgment concerning Wife's credibility:

> CREDIBILITY: Wife's behavior and responses throughout the trial and hearings in this case caused this Court to also question Wife's veracity and motive for prolonging the divorce. Wife came into a marriage with Husband, bringing very little in. She had an approximate separate net worth at the time of marriage of about $30,000. She was well acquainted with Husband's net worth and assets because of having worked as his assistant for a period of time. Wife has been unwilling to release Husband from the marriage and has made every effort to attach herself to many of the assets owned and/or acquired by Husband prior to and after the marriage.

In its judgment, the Trial Court analyzed the factors in Tenn. Code Ann. § 36-4-121(c) in making its distribution of the marital property and made the following findings of fact:

> 1. Duration of the marriage: These parties married on October 14, 2014. This is the third marriage for Husband and the first marriage for Wife (less than 5 years at the time of the divorce hearing). These parties have engaged

in elongated, contentious and expensive litigation over the course of the last two years. Litigation included an action for Breach of Contract involving Husband's business ventures, sales and purchases involving real estate and personal property, temporary spousal support, contempts and orders of protection. The Divorce Referee awarded Wife spousal support in the amount of $6,000 per month, effective March 1, 2017 (which continues pending entry of the court's order.) Additionally, Husband was ordered to continue paying Wife's Memphis Country Club dues, the deposit for her apartment rental and attorney fees and litigation expenses of $45,000.

2. <u>The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties</u>: There are health issues relative to both parties. Husband's current health issues appear to be more age related. He is 85 years of age and Wife is 52. Husband has an uncontroverted history of a stroke over ten years ago, back problems and hip and knee replacement, neck pain, difficulty with smelling and hearing, trouble focusing on details and more recently hernia surgery, and appears to be aging rapidly. Wife testified to an uncontroverted history of low white blood count for which she has been awaiting blood tests results since 2017. She also testified to being treated for hypothyroidism and having Hodgkin's Lymphoma, which is in remission. Additionally, she sees a cardiologist and is on medication for her heart, cholesterol and situational anxiety. There was no proof of mental health issues that would restrict Wife from employment. The age related deterioration of Husband has not prevented him from conducting his businesses.

3. Husband was born on February 5, 1935, and is currently eighty five (85) years old. He obtained both undergraduate and law degrees from Vanderbilt in the 1950's. He established himself in real estate dealings and has amassed a multi-million dollar estate.

4. Wife worked menial jobs prior to marrying Husband and was working part time earning $10 per hour at the time she met and married [Husband]. After the parties met and married, Wife worked in the businesses with Husband until they separated. Prior to the marriage and since the separation, Wife worked part-time at Welford's Antique Store, and the most she has earned is between $25,000 to $30,000 per year. Wife's testimony is that she attended the University of Memphis in 2003 and studied Exercise Health and Sports Science.

5. While Wife was born April 5, 1968 and is 52 years of age, has no college degree and some health issues, no proof was offered to show that Wife

cannot secure and maintain gainful employment.  Husband is 85 years of age and continues to operate his business concerns.

6. <u>The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party</u>: Neither of these parties contributed to the education or training of the other.  Wife had no prior experience with real estate dealings, but learned about the business while working with Husband.  Husband had established his wealth at the time of marriage and there is no proof of any dollar amounts increasing the business that are attributable to Wife, beyond work she did in the business.  Nothing suggests that Wife contributed to any increased earning power of Husband.  However, Wife did assist Husband in some of his business and non-profit endeavors.  Her work in the business increased her skills and likely her earning power and may make her more attractive to potential future employers.

7. <u>The relative ability of each party for future acquisitions of capital assets and income</u>: It is anticipated that Husband will continue to acquire major future acquisitions of capital assets and income, but the same is not so for Wife.  Wife will likely continue working part-time or full-time in retail or clerical type businesses.

8. <u>The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role</u>: As indicated, Wife did assist Husband in the negotiations of at least one contract to sell property and in the digitizing of two billboards and worked in the business as an assistant and a corporate officer.  She also assisted him with the work he did with his non-profit.  Wife testified that she took on [the] job of personal assistant to Husband.  Otherwise, Wife contributed to the marriage by being a homemaker for Husband.  Husband had established his wealth at the time of marriage and there is no proof of any dollar amounts increasing the business that is attributable to Wife, beyond work she did in the business.  While Wife received no salary from the business, she had access to and use of the finances and resources.

Wife contends that Husband dissipated marital assets by making multiple payments to Biff Concklin (whose services she questioned), for over almost 2 years at an amount of some $59,000.  Husband testified that Biff Concklin provided valuable services to him.  Wife testified that she did not know why Husband paid Concklin.  Nothing was offered by way of proof

to cause the court to find that any such payments rose to the level of being a dissipation of assets.

9. <u>The value of the separate property of each party</u>: The value of the separate property for Husband is $11,000,000, not including a personal injury lawsuit pending in Florida.

The value of the separate property for Wife is $228,283, not including a personal injury lawsuit pending in Florida.

10. <u>The estate of each party at the time of the marriage</u>: The uncontroverted proof is that Wife came into the marriage with an estate valued at approximately $30,000. Wife's testimony is that at the time of the marriage, she owned no real estate, no retirement and no savings. The expert's testimony is that had Wife not married Husband, her annual earnings would be approximately $5,000.

Husband's estate at the time of marriage is substantial, but no exact value is known. In light of the short term nature of this marriage, the court does not consider that a known value for his premarital estate is essential to the issues to be determined for the ultimate dissolution of the marriage and the marital assets.

11. <u>The economic circumstances of each party at the time of the division of property is to become effective</u>: Wife's circumstances at the time of the division of the marital estate is that she is dependent upon husband for support. She is working part-time and is expending all funds that are available to her from Husband. Husband's economic circumstances remain solid and substantial. He is the owner of the businesses and receives monthly income that is between $17,518 and $22,504 per month.

12. <u>The tax consequences to each party</u>: No proof was provided to the court relative to any tax consequences to these parties. They did file joint personal income tax returns during the marriage.

13. <u>Such other factors as are necessary to consider the equities between the parties</u>: The court finds that Husband had established his wealth at the time of marriage and there is no proof of any dollar amounts increasing the businesses that are attributable to Wife, beyond work she did in the business, for which she has been compensated financially, and as a spouse with access to use of resources. Wife did assist Husband with the sale of a certain lot, owned by husband, to Hilton. Proceeds were to be put back into St. Charles Place. Wife also assisted Husband with negotiating the leases

for two digital billboards.

The testimony of expert witness, Malcolm Meyers, is that Husband contributed assets to capitalize St. Charles Place. As an allowable tax expenditure, Husband paid personal expenses out of the corporate account to reduce the corporate debt to himself. The proof was that this is not considered income to Husband for tax purposes.

In addition to the foregoing, the Trial Court found as follows concerning the ownership of the billboards and the Billboard Marketing Agreements and Wife's contribution thereto:

The court ruled on the ownership issues of the business, determining that Husband owned the property and billboards prior to the marriage and that they continued to be Husband's separate property. Wife has no legal interest in the businesses, but there was a mixture of business and personal use of some accounts of the businesses. Wife expressed that she was an assistant to Husband. Further, that as part of the divorce, the court would determine if and what equitable interest Wife had in the business.

* * *

SHORT-TERM MARRIAGE. These parties were married October 14, 2014 and Husband filed for divorce on February 22, 2017. This court has found that Husband had amassed his fortune and wealth prior to the marriage and without the assistance of Wife. Wife worked in the business prior to the marriage and during the marriage. They lived together as husband and wife for less than three years. Wife has had no involvement with the business and Husband's earnings since the separation. The court defines this as a short-term marriage. In accordance with Tennessee Law, the court considers that it should place the parties back as near as possible to their pre-marriage state.

* * *

## II. TRANSMUTATION

Wife asserts that the marital residence and all of the real property of the businesses, including the Education Foundation, have been transmuted into marital property. She alleges that the billboard leases and bank accounts were all transmuted.

Transmutation requires that the formerly separately owned property be transformed into the use and benefit of the marriage. It is required that the parties intended that the separate property becomes marital property.

Proof in the case is that Wife worked in the business to assist Husband in his ongoing concerns. Wife testified that she took on the job of personal assistant to Husband. The court has already found that the business concerns were owned initially [by] Husband prior to the marriage, then by the corporations. Wife was not a shareholder in the corporations.

Notwithstanding the corporate nature of the businesses, Wife was integral in the sale of the lot to Hilton and in the negotiations of the leases that converted two of the billboards. The court finds that while the property and the contracts are owned by Husband and the Corporate entity, the Renasant #7558 account was transmuted by the parties and used for business and personal use.

### III. CORPORATE PROPERTY AND BUSINESS ENTITIES

The court allocates the billboards and/or lease terms and other properties owned by the corporate entities to those corporate entities, not to the Husband as his individual property, for purposes of this division of marital assets.

----Billboard located at 8473 Hwy 64 (St. Charles Place; Steak N Shake billboard)
----LED Billboard 8840 I-40 (St. Charles Place; 0 Ricky Bell Cove)
----Billboard 2106 (St. Charles Place; River Oaks Billboard; 0 Poplar Venue)
----Billboard Marketing Agreement Lease located at 0 Ricky Bell Cove; I-40 & Wolfchase)
----Billboard Marketing Agreement Lease located at 5871 Poplar Ave.; 0 Poplar Ave., River Oaks)
----O'Charley's Lease (St. Charles Place)
----Elena's Taco Shop Lease (8610 Rickey Bell Cove)

| | |
|---|---|
| St. Charles Place, Inc. | $(See Assets)* |
| St. Charles Place Education Foundation | $(See Assets)* |
| 8610 Ricky Bell Cove (Elena's Taco Shop) | $402,100.00 |
| 0 Poplar Avenue Billboard (River Oaks Billboard) /5871 Poplar Avenue | $1,000,800.00 |
| 2798 New Brunswick Road | $942,500.00 |
| 2844 New Brunswick Road (Lot 14, St. Charles Pl.) | $2,313,900.00 |

- 12 -

| | |
|---|---|
| New Brunswick Road, Lot 9 | $61,800.00 |
| 0 Ricky Bell Cove, Lot A | $500.00 |
| 0 Ricky Bell Cove, Lot 15 | $332,000.00 |
| 8473 Hwy 64, Lot 1 | $130,000.00 |
| Bank of Bartlett #1252 (St. Charles Pl.) | $55,747.00 |
| Renasant Bank Checking #6487 (St. Charles Pl.) | $1,555.00 |
| Regions #9096 (owned by St. Charles Pl.) | $(Closed) |
| Fleetwood Recreational Vehicles | $75,000.00** |

*[The court notes that neither party placed a value on St. Charles Place, Inc., or St. Charles Place Education Foundation. The explanation given is that these were either owned by the Husband prior to the marriage or like St. Charles Place Education Foundation, had no value.]
**[Titled to husband, but used in the 501(c) entity.]

* * *

## IV. MARITAL PROPERTY

* * *

Wife suggests that the marital estate is comprised of all of the rent proceeds of the business leases, lease proceeds, bank accounts, real property and personal property.

* * *

The court classifies the above disputed property as follows:

* * *

4. 0 Rickey Bell Cove Billboard Marketing Agreement: This property is allocated as corporate property. These proceeds are the property of the corporation, but are a basis for income for the parties. To the extent it is reported on tax returns, the income is past marital income. Since the parties will no longer file joint returns, based upon the court's rulings, this is not calculated or further included.

5. 5871 Poplar Avenue Billboard Marketing Agreement:
This property is allocated as corporate property. These proceeds are the property of the corporation, but are a basis for income for the parties. To the extent the income is reported on tax returns, the income is past marital

income. Since the parties will no longer file joint returns, based upon the court's rulings, this is not calculated or further included.

\* \* \*

7. Proceeds from Outfront Media: These proceeds are the property of the corporation, but are a basis for income for the parties. To the extent it is reported on tax returns, the income is past marital income. Since the parties will no longer file joint returns, based upon the court's rulings, this is not calculated or further included.

8. 0 Rickey Bell Cove Billboard Marketing Agreement: These proceeds are the property of the corporation, but is a basis for income for the parties. To the extent the income is reported on tax returns, it is past marital income. Since the parties will no longer file joint returns, based upon the court's rulings, this is not calculated or further included.

9. 5871 Poplar Avenue Billboard Marketing Agreement: These proceeds are the property of the corporation, but is a basis for income for the parties. To the extent the income is reported on tax returns, it is past marital income. Since the parties will no longer file joint returns, based upon the court's rulings, this is not calculated or further included.

The Trial Court valued Husband's separate property at $11,000,000 and Wife's separate property at $228,283. After designating the disputed property as either separate or marital property, the Trial Court divided the parties' marital property as follows:

The parties agree that the following are marital assets and they are allocated as follows:

| | | |
|---|---|---|
| 1. 2015 Mercedes Benz E350 | $30,000 | Wife |
| 2. Proceeds from sale of 2016 Honda CR-V | $20,000 | Wife(1/2) Husband(1/2) |
| 3. First Tennessee Bank Checking Account . . . | $1,604 | Wife |
| 4. Tesla Model 3 Down payment | $1,000.00 | Wife (1/2) Husband(1/2) |
| 5. Renasant Bank #7558 | $178,365.00 | Husband(1/2) Wife (1/2) |
| 6. Proceeds from Personal injury | $(Unknown) | Wife |
| 7. Income declared by parties from the business (the court finds that this would be monies already designated in the Renasant #7558 account) | | |
| 8. Landscaping Power Equipment | $2,200 | Husband |
| 9. Memphis Country Club Membership | $(Unknown) | Husband |

- 14 -

10. Closed Regions Account . . .                    $22,000          Wife

             Total Award to Husband    $101,882.50
             Total Award to Wife         $155,486.50
(These total awards do not include amounts for the unknown values).

Wife timely filed a notice of appeal to this Court. Subsequently, Husband died in August 2020, and the appellee, Malcolm D. Myers as Executor of the Estate of Charles Price Boone ("the Estate") was substituted as a party to the action.

## **Discussion**

Although not stated as such, Wife raises the following issues for our review on appeal: (1) whether the evidence presented at trial preponderates against the Trial Court's finding that the two Billboard Marketing Agreements with Outfront Media were not marital property but instead Husband's separate property owned through his solely-owned corporation; (2) whether the Trial Court erred by failing to assign a value to the Billboard Marketing Agreements as part of the marital estate, and without a valuation, whether the distribution of marital property is inequitable and a remand required for an equitable distribution of the marital estate; and (3) whether Wife should be awarded her attorney's fees on appeal. The Estate raises the following additional issue for appellate review, which likewise has been restated slightly: whether this Court erred in its distribution of marital property due to the short-term nature of the marriage.

We first address Wife's issue concerning the classification of the two Billboard Marketing Agreements. The classification of property during a divorce proceeding as either marital or separate property is a question of fact to be determined by the trial court upon consideration of all relevant circumstances. *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245 (Tenn. 2009). We review questions of fact de novo upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014).

In its ruling, the Trial Court made findings concerning Wife's credibility. As to findings regarding credibility, our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of

- 15 -

credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

The division of the parties' property begins with the identification and classification of all property interests. *Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007). All property should be classified as either marital or separate property prior to distribution of the marital estate because the trial court does not have the authority to make an equitable distribution of separate property. *Id.* Generally, unless proven otherwise, property acquired by either spouse during the marriage is presumed to be marital property, while property acquired by either party prior to the marriage is presumed to be separate property. *Trezevant v. Trezevant*, 568 S.W.3d 595, 615 (Tenn. Ct. App. 2018), *perm. app. denied* (Tenn. Sept. 18, 2018); *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007). If a spouse seeks to have the other spouse's separate property classified as marital property, he or she bears the burden of proving that such property has become marital property as defined in Tenn. Code Ann. § 36-4-121(b)(1). *Keyt*, 244 S.W.3d at 328. Similarly, a spouse seeking to have property acquired during the marriage deemed as separate property has the burden of proving the asset is separate property, which can be proven by the types of evidence found in Tenn. Code Ann. § 36-4-121(b)(2)(B)-(F). *Owens*, 241 S.W.3d at 485-86.

Courts must look to Tenn. Code Ann. § 36-4-121 when classifying property as marital or separate. Tenn. Code Ann. § 36-4-121(b) (2021) provides, in pertinent part, as follows:

(1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date. . . .

(B)(i) "Marital property" includes income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation;

- 16 -

(ii) "Marital property" includes the value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefit rights accrued as a result of employment during the marriage;

(iii) The account balance, accrued benefit, or other value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefits accrued as a result of employment prior to the marriage, together with the appreciation of the value, shall be "separate property." In determining appreciation for purposes of this subdivision (b)(1)(B)(iii), the court shall utilize any reasonable method of accounting to attribute postmarital appreciation to the value of the premarital benefits, even though contributions have been made to the account or accounts during the marriage, and even though the contributions have appreciated in value during the marriage; provided, however, the contributions made during the marriage, if made as a result of employment during the marriage and the appreciation attributable to these contributions, would be "marital property." When determining appreciation pursuant to this subdivision (b)(1)(B)(iii), the concepts of commingling and transmutation shall not apply;

(iv) Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire separate assets of the employee spouse shall be deemed to have come from the separate portion of the account, up to the total of the separate portion. Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire marital assets shall be deemed to have come from the marital portion of the account, up to the total of the marital portion;

* * *

(D) As used in this subsection (b), "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine;

* * *

(2) "Separate property" means:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 (26 U.S.C.), as amended;

(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); [and]

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent . . . .

(Footnote omitted).

Our Supreme Court discussed the concepts of marital property and separate property in *Langschmidt v. Langschmidt* and noted that in addition to the statutory provisions contained in Tenn. Code Ann. § 36-4-121(b), Tennessee intermediate appellate courts have recognized two methods by which separate property may be converted into marital property. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002). These two methods are commingling and transmutation, which the Supreme Court noted have been described by this Court as follows:

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt*, 81 S.W.3d at 747 (internal citations omitted).

Wife argues that the Trial Court erred by failing to classify the Billboard Marketing Agreements as marital property. It is undisputed that Husband or his corporation owned the two billboards at issue prior to the marriage, as well as the real property upon which the billboards were located. The Trial Court found that the billboards and real property were the separate property of either Husband or his corporation. On appeal, Wife has not raised an issue regarding ownership of the

- 18 -

billboards or the land underneath the billboards, only the Billboard Marketing Agreements. Therefore, we will only address classification of the Billboard Marketing Agreements. It is further undisputed that Wife assisted Husband with the business after they were married. The Trial Court found that Wife had acted as an assistant to Husband and a corporate officer with St. Charles Place, Inc. Wife had assisted Husband in the business with the sale of a piece of real property to Hilton, the proceeds of which were put back into the corporation and used to upgrade two of the billboards to digital.

The Billboard Marketing Agreements were entered into concerning those two billboards. We acknowledge that Wife was listed in the body of the contract as an owner of the two billboards and had signed the Billboard Marketing Agreements at the request of Outfront Media. However, Husband wrote on the signature line that St. Charles Place was the owner and signed the contract as the president of St. Charles Place, Inc. Despite participating in Husband's business, Husband never added Wife to either deed concerning the two billboard properties or the required permits for the billboards. Although not determinative, Wife also was not included as an owner of the billboard on the application to obtain the building permit for construction code enforcement required to upgrade one of the billboards.

The Trial Court found that the two Billboard Marketing Agreements were owned by the corporation. Although Wife is listed as an owner in the body of the Billboard Marketing Agreements, Husband never completed any paperwork in order to officially provide Wife with an ownership interest in the billboards, either in his individual capacity or on behalf of the corporation. At the time the parties entered into the contracts, Wife had no ownership interest in the billboards or the property where the billboards are located. Wife's name being listed as an owner of the billboards in a contract with a third party, wherein the contract also identified St. Charles Place, Inc. as the owner, does not transmute the Billboard Marketing Agreements into marital property.

Importantly, we note that the Trial Court made findings regarding Wife's credibility. The Trial Court questioned Wife's veracity and motive for prolonging the divorce proceedings. The Trial Court noted that Wife came into the marriage with little property and had "made every effort to attach herself to many of the assets owned and/or acquired by Husband prior to and after the marriage." As instructed in *Hughes*, we provide great deference to the Trial Court's credibility determinations, which will not be overturned on appeal unless clear and convincing evidence proves otherwise. In this case, we find no clear and convincing evidence exists to rebut the Trial Court's credibility findings regarding Wife.

Although the Billboard Marketing Agreements were entered into during the marriage, Husband and his corporation had owned the billboards and the real property on which they were located prior to the marriage. In its judgment, the Trial Court considered the evidence presented and determined that the corporate entity owned by

- 19 -

Husband was the owner of the Billboard Marketing Agreements. The evidence presented does not preponderate against the Trial Court's finding in this regard. Therefore, we affirm the Trial Court's classification of the Billboard Marketing Agreements as the property of Husband's wholly-owned corporation and not marital property. Wife's issue concerning the necessity of valuing the Billboard Marketing Agreements to distribute as marital property is pretermitted by our holding affirming the Trial Court's classification of the agreements as corporate property.

We next address the Estate's issue concerning whether the Trial Court erred in its distribution of marital property. A trial court has wide discretion when classifying and dividing the marital estate, and its findings are entitled to great weight on appeal. *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002). Therefore, unless a trial court's decision concerning the division of property is contrary to the preponderance of the evidence or is based on an error in law, we will not interfere with the trial court's decision on appeal. *Id.*

Courts must look to Tenn. Code Ann. § 36-4-121(c) when determining how to distribute marital property in a divorce. In pertinent part, Tenn. Code Ann. § 36-4-121(c) provides:

> (c) In making equitable division of marital property, the court shall consider all relevant factors including:
>
> (1) The duration of the marriage;
>
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
>
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
>
> (4) The relative ability of each party for future acquisitions of capital assets and income;
>
> (5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
>
> (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for

equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.

The Estate argues on appeal that the Trial Court erred in its distribution of marital assets by not placing Husband and Wife in a position comparable to where they were prior to this short-term marriage. As this Court has held, "[i]n cases involving a marriage of relatively short duration, it is appropriate to divide the property in a way that, as nearly as possible, places the parties in the same position they would have been in had the marriage never taken place." *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). In *Batson*, this Court found that a marriage of a little over five years was a marriage of relatively short duration. *Id.* at 859-60.

In its distribution of marital assets, the Trial Court considered each of the relevant enumerated factors in Tenn. Code Ann. § 36-4-121(c) in making its determination. Husband and Wife were married only for approximately five years. Of those five years, Husband and Wife were married for less than three years when they separated in 2017. We agree with the Trial Court that this marriage is of a relatively short duration.

Husband came into this marriage with significant assets, while Wife had very few assets of value. The Trial Court found that Husband had "amassed his fortune and wealth prior to the marriage and without the assistance of Wife." Many of those assets accumulated by Husband had remained either Husband's separate property or the property of Husband's wholly-owned corporation. The Trial Court valued Husband's separate property at the time of divorce at $11 million. Additionally, the Trial Court valued Wife's property prior to the marriage at $30,000, and her separate property at the time of divorce at $228,283.[5]

At the time of the divorce, Husband was 85 years old and Wife was 52 years of age. Both parties had health issues at the time of trial but the Trial Court found that there was no evidence that any of Wife's medical conditions would prevent her from being employed. Prior to the marriage, Wife had earned income at most between $25,000 and $30,000 per year. At the time of trial, Wife was employed at the same antique store she worked at prior to the marriage. Although Wife testified that she was only working one or two days a week and claimed she was financially dependent on Husband, the Trial Court found that there was no evidence presented to suggest that Wife would be unable to obtain and maintain gainful employment following the divorce. We note that the Trial Court incorrectly stated in its order that Wife had no college degree; however, the existence of Wife's college degree further supports the Trial Court's finding concerning her ability to obtain employment.

Neither party had contributed to the other's education or training during the marriage. However, the Trial Court found that by working in Husband's business, Wife had increased her skills and earning power, making her a more attractive candidate for potential employers in the future. During the marriage, Wife had worked in Husband's separately-owned corporation without earning a salary but the Trial Court found that Wife had access to Husband's finances and resources during this time. Additionally, the Trial Court found that there was no evidence that Wife had contributed to the appreciation of the corporation other than her work in the company. Although Wife claimed that Husband had dissipated assets, there was no evidence presented to show that the payments Husband made to Mr. Concklin rose to the level of dissipation.

Wife had worked for Husband's corporation without earning a salary and had assisted Husband in negotiating the sale of at least one piece of property and negotiating the Billboard Marketing Agreements. The Trial Court found that Wife acted as an assistant to Husband and corporate officer in the business. Wife also assisted Husband with his non-profit. Husband had significant separate property leaving the marriage. Although Wife is leaving the marriage with more assets than she brought into the marriage, including roughly 60% of the marital assets, we cannot say that the Trial Court

---

[5] At the time of the divorce, a personal injury lawsuit was pending in Florida. The Trial Court did not include the value of the lawsuit in its calculation of their respective separate property.

abused its discretion in its division of marital property in this short-term marriage based on the circumstances in this case. Even if we are in error in determining that the Billboard Marketing Agreements were not transmuted into martial property, it would have been necessary for the Trial Court to award the agreements to Husband as part of its distribution of marital property in order to place the parties into the positions near what they would have been in had this short-duration marriage not occurred. We, therefore, affirm the Trial Court's distribution of the parties' marital property.

As a final matter, we address whether Wife is entitled to an award of attorney's fees incurred during this appeal. An award of attorney's fees incurred on appeal is within our discretion. *See Andrews v. Andrews*, 344 S.W.3d 321, 340 (Tenn. Ct. App. 2010). In the exercise of that discretion, we decline to award attorney's fees to Wife especially considering Wife was not successful with her issues raised on appeal.

## **Conclusion**

Based on the foregoing, the Trial Court's judgment is affirmed in all respects. We remand to the Trial Court for collection of the costs assessed below. Costs on appeal are assessed one-half to the appellant, Dawna Divine Boone, and her surety, if any, and one-half to the appellee, Malcolm D. Myers as Executor of the Estate of Charles Price Boone.

_____
D. MICHAEL SWINEY, CHIEF JUDGE